# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CARPENTERS PENSION FUND OF ILLINOIS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) Case No.: |
| Plaintiff, | ) **CLASS ACTION** ) ) **COMPLAINT FOR VIOLATIONS OF** |
| v. | ) **THE FEDERAL SECURITIES LAWS** ) ) **DEMAND FOR JURY TRIAL** |
| ENVISION HEALTHCARE CORPORATION f/k/a ENVISION HEALTHCARE HOLDINGS, INC., CHRISTOPHER A. HOLDEN, WILLIAM A. SANGER, CLAIRE M. GULMI, RANDEL G. OWEN, MICHAEL L. SMITH, RONALD. A. WILLIAMS, MARK V. MACTAS, RICHARD J. SCHNALL, CAROL J. BURT, JAMES D. SHELTON, and LEONARD M. RIGGS, JR. M.D., | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ........................................................................................... 1

II. JURISDICTION AND VENUE ..................................................................................... 3

III. PARTIES ........................................................................................................................ 4

IV. SUBSTANTIVE ALLEGATIONS ................................................................................ 6

   A. Background ............................................................................................................. 6

   B. Defendants' Materially False and Misleading Statements.................................... 7

   C. The Truth Is Revealed ........................................................................................ 17

V. CLASS ACTION ALLEGATIONS ............................................................................. 20

VI. UNDISCLOSED ADVERSE FACTS .......................................................................... 22

VII. LOSS CAUSATION ..................................................................................................... 23

VIII. SCIENTER ALLEGATIONS....................................................................................... 25

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
     MARKET DOCTRINE ................................................................................................ 25

X. NO SAFE HARBOR .................................................................................................... 26

XI. COUNTS AGAINST DEFENDANTS ......................................................................... 27

   COUNT I............................................................................................................................ 27

   COUNT II .......................................................................................................................... 31

   COUNT III ……………………………………………………………………………....32

XII. PRAYER FOR RELIEF .............................................................................................. 34

XIII. JURY TRIAL DEMANDED ....................................................................................... 35

Plaintiff Carpenters Pension Fund of Illinois ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Envision Healthcare Corporation f/k/a Envision Healthcare Holdings, Inc. ("Envision" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Envision's website concerning the Company's public statements; and (d) review of other publicly available information concerning Envision and the Individual Defendants.

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons or entities that purchased or otherwise acquired Envision securities between March 2, 2015 and September 18, 2017 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Envision, through one of its main subsidiaries called EmCare, provides physician services at emergency rooms nationwide. The Company in its current form is the result of a recent merger between Envision Healthcare Holdings, Inc. ("Legacy Envision") and AmSurg, Inc. ("AmSurg") that was completed on or about December 1, 2016 (the "Merger"). The newly combined company retained the Envision name. EmCare was historically part of Legacy Envision.

1

3.     This action involves a fraudulent and illegal scheme by Envision and its senior executives to artificially inflate Envision's stock price by ordering tests that were medically unnecessary, admitting patients from the emergency room into a hospital for financial rather than medical reasons, and billing for the most complex, expensive level of care in unwarranted situations.  Furthermore, Envision engaged in "surprise billing," in which patients who sought treatment at in-network facilities were treated by out-of network physicians and subsequently billed at higher rates.

4.     This systemic behavior was first disclosed to investors in an article entitled "The Company Behind Many Surprise Emergency Room Bills" published by *The New York Times* on July 24, 2017.  The article supports the allegations that the Company misrepresented the source of its revenues, emergency room and billing procedures, legal compliance, patient safety measures, and internal controls.

5.     In reaction to *The New York Times* article, Envision's share price declined $2.33 per share, or 3.72%, from a close of $62.61 per share on July 21, 2017 to a close of $60.28 per share on July 24, 2017.

6.     On September 18, 2017, Envision announced significant organizational changes, including the retirement of its Chief Financial Officer ("CFO"); a newly established position of Chief Operating Officer; and the resignation of the President of Physician Services.

7.     Following this announcement, Envision's stock price dropped $4.56 per share, or nearly 10%, from $47.67 per share on September 18, 2017 to $43.11 per share on September 19, 2017.

8.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements, and/or failed to disclose material adverse facts about the

Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of its illicit business practices; (2) the Company ordered physicians to administer tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial reasons, and bill for the most complex, expensive level of care in unwarranted situations; (3) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians; (4) EmCare accordingly billed these patients at higher rates than if the patients had received treatment from in-network physicians; (5) the Company's statements attributing EmCare's Class Period growth to other factors while failing to disclose that these illicit practices were materially contributing to the Company's growth were therefore false and/or misleading; and (6) as a result of the foregoing, Defendants' statements about Envision's business, operations, and prospects were false and misleading and/or lacked a reasonable basis when they were made. As a result of this fraudulent scheme, Defendants were able to artificially inflate and/or maintain the Company's financials throughout the Class Period.

9. As a direct result of Defendants' wrongful actions, Envision's common stock traded at artificially inflated prices throughout the Class Period.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.  JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's principal executive offices are located within this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

15.     Plaintiff Carpenters Pension Fund of Illinois, as set forth in the accompanying certification, incorporated by reference herein, purchased Envision common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Envision is headquartered in Nashville, Tennessee, with principal executive offices located at 1A Burton Hills Boulevard, Nashville, Tennessee 37215. Envision's shares trade on the NYSE under the ticker symbol "EVHC."

17.     Defendant Christopher A. Holden ("Holden") has served as the Company's Chief Executive Officer ("CEO") and President since December 2016. Holden previously served as a Director, President, and CEO of AmSurg from 2007-2016.

4

18.    Defendant William A. Sanger ("Sanger") served as the Company's CEO from May 2011 until December 2016.  Sanger served on Envision's Board of Directors at the time of the Merger.

19.    Defendant Claire M. Gulmi ("Gulmi") has served as the Company's CFO since December 2016. On September 18, 2017, the Company announced that Gulmi would retire effective October 2, 2017.

20.    Defendant Randel G. Owen ("Owen") served as the Company's CFO from February 2005 to December 2016.

21.    Defendants Holden, Sanger, Gulmi, and Owen are collectively referred to hereinafter as the "Officer Defendants."

22.    Defendant Michael L. Smith ("Smith") served on Envision's Board of Directors at the time of the Merger.

23.    Defendant Ronald. A. Williams ("Williams") served on Envision's Board of Directors at the time of the Merger.

24.    Defendant Mark V. Mactas ("Mactas") served on Envision's Board of Directors at the time of the Merger.

25.    Defendant Richard J. Schnall ("Schnall") served on Envision's Board of Directors at the time of the Merger.

26.    Defendant Carol J. Burt ("Burt") served on Envision's Board of Directors at the time of the Merger.

27.    Defendant James D. Shelton ("Shelton") served on Envision's Board of Directors at the time of the Merger.

28.     Defendant Leonard M. Riggs, Jr. M.D. ("Riggs") served on Envision's Board of Directors at the time of the Merger.

29.     Defendants Sanger, Smith, Williams, Mactas, Schnall, Burt, Shelton, and Riggs are collectively referred to hereinafter as the "Director Defendants."

30.     The Officer Defendants and Director Defendants are collectively referred to hereinafter as the "Individual Defendants."

31.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Envision's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

IV.     **SUBSTANTIVE ALLEGATIONS**

        A.     **Background**

32.     Founded in 1992, Envision is one of the largest providers of healthcare services in the United States. The Company provides physician services, ambulatory surgery services, post-

6

1373222.1
Case 3:17-cv-01323    Document 1    Filed 09/29/17    Page 8 of 37 PageID #: 8

acute care, and medical transportation. EmCare, one of Envision's subsidiaries, is the nation's largest physician practice management company, with more than 16,000 clinicians providing services at over 4,600 healthcare facilities. EmCare is the only company in the United States that provides hospitals with the ability to contract with a single entity for clinical department outsourcing, including: emergency medicine, hospital medicine, acute care surgery, anesthesiology, and radiology.

33.     On June 15, 2016, Legacy Envision and AmSurg, a manager of physician practice-based ambulatory surgery centers and specialty physician networks, entered into a definitive merger agreement pursuant to which the companies would combine in an all-stock transaction. Legacy Envision shareholders would own approximately 53% and AmSurg shareholders would own approximately 47% of the combined organization on a fully diluted basis. Upon completion of the merger on December 1, 2016, the combined company was renamed Envision Healthcare Corporation and co-headquartered in Nashville, Tennessee and Greenwood Village, Colorado.

**B.     Defendants' Materially False and Misleading Statements**

34.     The Class Period begins on March 2, 2015, when Envision filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). For the quarter, Envision reported net income of $27.38 million, or $0.53 per diluted share, on revenue of $581.81 million, compared to net income of $19.56 million, or $0.61 per diluted share, on revenue of $279.1 million for the same period in the prior year. For 2014, Envision reported net income of $53.7 million, or $2.06 per diluted share, on revenue of $1.62 billion, compared to net income of $72.7 million, or $2.28 per diluted share, on revenue of $1.06 billion for 2013.

35.    In the 2014 10-K, Envision stated, in relevant part:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities.**    Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by healthcare facilities, communities and payors. ***We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.*** At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities. In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts. We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.**    Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients. We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies. At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services. Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States. In addition, our Complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives. ***These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2009 to 24% in 2014***. At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line. (Emphasis added.)

8

36.     The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sanger and Owen, certifying that "the information contained in the [2014 10-K] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

37.     On May 8, 2015, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, Envision reported net income of $21.04 million, or $0.39 per diluted share, on revenue of $570.45 million, compared to net income of $17.2 million, or $0.54 per diluted share, on revenue of $259.56 million for the same period in the prior year.

38.     In the Q1 2015 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 5% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

39.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q1 2015 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

40.     On August 3, 2015, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, Envision reported net income of $33.68 million, or

9

1373222.1

$0.65 per diluted share, on revenue of $641.95 million, compared to net income of $18.96 million, or $0.59 per diluted share, on revenue of $278.23 million for the same period in the prior year.

41.     In the Q2 2015 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2015, approximately 76% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 84% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 16% was generated from billings to hospitals and affiliated physician groups for professional services.

42.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q2 2015 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

43.     On November 3, 2015, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Envision reported net income of $42.66 million, or $0.83 per diluted share, on revenue of $650.23 million, compared to a net loss of $9.83 million, or $0.26 per diluted share, on revenue of $503.23 million for the same period in the prior year.

44.     In the Q3 2015 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2015, approximately 74% was derived from our hospital contracts for emergency department staffing, 7% from contracts related to anesthesiology services, 9% from our hospitalist/inpatient services, 6% from our post-acute care services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and 2% from other hospital management services. Approximately 83% of EmCare's net revenue was generated from billings to third party payors and patients for patient encounters and approximately 17% was generated from billings to hospitals and affiliated physician groups for professional services.

45.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q3 2015 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

46.     On February 29, 2016, Envision filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"). For the quarter, Envision reported net income of $65.57 million, or $1.24 per diluted share, on revenue of $704.26 million, compared to net income of $27.38 million, or $0.53 per diluted share, on revenue of $581.81 million for the same period in the prior year. For 2015, Envision reported net income of $162.95 million, or $3.16 per diluted share, on revenue of $2.57 billion, compared to net income of $53.7 million, or $3.16 per diluted share, on revenue of $1.62 billion for 2014.

47.     In the 2015 10-K, Envision stated, in relevant part:

**Business Strategy**

We intend to enhance our leading market positions by implementing the following key elements of our business strategy:

**Capitalize on Organic Growth Opportunities**.  Our scale and scope, leading market positions and long operating history combined with our value-enhancing initiatives, provide us with competitive advantages to continue to grow our business. We intend to gain market share from local, regional and national competitors as well as through continued outsourcing of clinical services by

11

healthcare facilities, communities and payors. ***We believe that EmCare is well-positioned to continue to generate significant organic growth due to its integrated service offerings, differentiated, data-driven processes to recruit and retain physicians, scalable technology and sophisticated risk management programs. We believe these factors have driven EmCare's strong track record in obtaining new contracts and retaining existing customers.*** At AMR, we believe market share gains will be driven by our strong clinical expertise, high-quality service, strong brand recognition and advanced information technology capabilities. In particular, our proprietary clinical database of patient transports, including detailed tracking of mortality rates and resuscitation metrics, provides analytical support to AMR's differentiated clinical results and has been a key factor in obtaining new contracts. We anticipate driving significant organic growth in Evolution Health by adding new contracts to meet the demand for physician-led care management solutions outside the hospital.

**Grow Complementary and Integrated Service Lines.** Our continued focus on cross-selling and offering integrated services across the patient continuum has helped hospital systems, communities and payors to realize economic benefits and clinical value for patients. We continue to enter complementary service lines at both EmCare and AMR that leverage our core competencies. At EmCare, we continue to expand and integrate our ED, anesthesiology, hospitalist, post-hospital, radiology, tele-radiology and surgery services. Our ability to cross-sell EmCare services is enhanced by our national and regional contracts that provide preferred access to certain healthcare facilities throughout the United States. In addition, our complete Care package, which is an integrated offering of ED and hospitalist services in primarily rural communities, has been one of our most successful recent growth initiatives. ***These factors, among others, have increased the percentage of healthcare facilities utilizing multiple EmCare service lines from 11% in 2010 to 22% in 2015***. At AMR, we have expanded service lines, such as our managed transportation operations, fixed-wing air transportation services and community paramedic programs, with both new and existing customers. We expect Evolution Health to be a catalyst for cross-selling our services across all of our businesses and not just within a particular segment or service line. (Emphases added)

48.     The 2015 10-K contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [2015 10-K] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

49.     On May 6, 2016, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). For the quarter, Envision reported net income of $30.86 million, or $0.53

per diluted share, on revenue of $724.68 million, compared to net income of $21.04 million, or

$0.39 per diluted share, on revenue of $570.45 million for the same period in the prior year.

50.     In the Q1 2016 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the three months ended March 31, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

51.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q1 2016 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

52.     On August 3, 2016, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). For the quarter, Envision reported net income of $46.07 million, or $0.80 per diluted share, on revenue of $758.50 million, compared to net income of $33.68 million, or $0.65 per diluted share, on revenue of $641.95 million for the same period in the prior year.

53.     In the Q2 2016 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the six months ended June 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 12% from our hospitalist/inpatient services, 11% from our post-acute care

13

services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 1% from our radiology/tele-radiology services, 1% from our surgery services, and less than 1% from other hospital management services. Approximately 79% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 21% was generated from billings to hospitals and affiliated physician groups for professional services.

54.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q2 2016 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

55.     On October 21, 2016, Envision and AmSurg filed a Definitive Proxy Statement on Schedule 14A ("Proxy Statement") urging investors to approve the Merger.  The Proxy Statement incorporate by reference Envision's financial results from 2011-2016, and "in the opinion of Envision's management, include[d] all normal and recurring adjustments that are considered necessary for the fair presentation of the results for the interim periods."  As indicated in the Proxy Statement, the Board of Directors of both AmSurg and Envision unanimously recommended that their respective shareholders approve the Merger, instructing investors to "rely only on the information contained in or incorporated by reference into this joint proxy statement/prospectus."

56.     On November 3, 2016, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Envision reported net income of $39.95 million, or $0.69 per diluted share, on revenue of $822.22 million, compared to net income of $42.66 million, or $0.83 per diluted share, on revenue of $650.23 million for the same period in the prior year.

57.     In the Q3 2016 10-Q, Envision stated, in part:

**EmCare**

Of EmCare's net revenue for the nine months ended September 30, 2016, approximately 65% was derived from our hospital contracts for emergency department staffing, 11% from our hospitalist/inpatient services, 11% from our post-acute care services, 6% from contracts related to anesthesiology services, 4% from our locum tenens services, 2% from our surgery services, 1% from our radiology/tele-radiology services, and less than 1% from other hospital management services. Approximately 80% of EmCare's net revenue was generated from billings to third-party payors and patients for patient encounters and approximately 20% was generated from billings to hospitals and affiliated physician groups for professional services.

58.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Sanger and Owen, certifying that "the information contained in the [Q3 2016 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

59.     On March 1, 2017, Envision filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K"). For the quarter, Envision reported a net loss of $135.5 million, or $1.84 per diluted share, on revenue of $1.39 billion, compared to net income of $65.57 million, or $1.24 per diluted share, on revenue of $704.26 million for the same period in the prior year. For 2016, Envision reported a net loss of $18.6 million, or $0.47 per diluted share, on revenue of $3.7 billion, compared to net income of $162.95 million, or $3.16 per diluted share, on revenue of $2.57 billion for 2015.

60.     The 2016 10-K contained signed certifications pursuant to SOX by Defendants Holden and Gulmi, certifying that "the information contained in the [2016 10-K] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

61.     On May 5, 2017, Envision filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q"). For the quarter, Envision reported a net loss of $445.2 million, or $3.84 per diluted share, on revenue of $1.88 billion, compared to net income of $30.86 million, or $0.53 per diluted share, on revenue of $724.68 million for the same period in the prior year.

62.     The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Holden and Gulmi, certifying that "the information contained in the [Q1 2017 10-Q] fairly presents, in all material aspects, the financial condition and results of operations of the Company."

63.     The statements referenced in ¶¶34-62 were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business and operations, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of its illicit business practices; (2) the Company ordered physicians to administer tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial reasons, and bill for the most complex, expensive level of care in unwarranted situations; (3) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians; (4) EmCare accordingly billed these patients at higher rates than if the patients had received treatment from in-network physicians; (5) the Company's statements attributing EmCare's Class Period growth to other factors while failing to disclose that these illicit practices were materially contributing to the Company's growth were therefore false and/or misleading; and (6) as a result of the foregoing,

16

Defendants' statements about Envision's business, operations, and prospects were false and misleading and/or lacked a reasonable basis when they were made. As a result of this fraudulent scheme, Defendants were able to artificially inflate the Company's financials throughout the Class Period.

### C. The Truth Is Revealed

64. On July 24, 2017, *The New York Times* reported, in an article titled "The Company Behind Many Surprise Emergency Room Bills," that hospitals associated with EmCare were disproportionately likely to engage in "surprise billing," in which patients who go to in-network hospitals are treated by out-of-network physicians and subsequently billed at higher rates.

65. According to a study conducted by researchers at Yale University and discussed in detail in the article, the rate of out-of-network doctor's bills for customers of one large insurer jumped when EmCare entered a hospital. The Yale researchers, who examined nearly nine million visits made to emergency rooms run by a variety of companies between 2011 and 2015, suggest that EmCare failed to sign contracts with insurance providers, thereby allowing it to charge higher rates. Fiona Scott Morton, a professor at the Yale School of Management and a co-author of the paper, described the strategy as a "kind of ambushing of patients." A patient who goes to the emergency room can look for a hospital that takes its insurance but rarely gets to choose the treating physician.



66.    The article also highlighted that EmCare physicians used higher billing codes than their predecessors at an exorbitant rate, stating: "Before EmCare arrived, about 6 percent of patient visits in the hospital's emergency room were billed for the most complex, expensive level of care. After EmCare arrived, nearly 28 percent got the highest-level billing code." Additionally, Yale's study concluded that the rates of tests ordered and the number of patients admitted from the E.R. into a hospital rose once EmCare entered a hospital.  "It almost looked like a light switch was being flipped on," said Zack Cooper, a health economist at Yale who is one of the study's authors.



18



**Highest-level codes**



67.     The article also emphasized that "EmCare's emergency room management has come under scrutiny before."  Envision is a named defendant in two lawsuits filed by whistleblowers alleging that EmCare and Health Management Associates, a for-profit hospital chain, pressured E.R. doctors to increase admissions and tests, even when the physicians believed they were not medically necessary.  According to the lawsuits, the Company "repeatedly terminated physicians and E.R. medical directors" who pushed back.

68.     In reaction to the troubling facts disclosed in *The New York Times* article, Envision's share price declined $2.33 per share, or 3.72%, from a close of $62.61 per share on July 21, 2017 to a close of $60.28 per share on July 24, 2017.

69.     On September 18, 2017, Envision announced significant organizational changes, including the retirement of its CFO; a newly established position of Chief Operating Officer; and the resignation of the President of Physician Services.  The press release, titled "Envision Healthcare Announces Organizational Changes to Align Senior Leadership Structure with Physician-Centric Strategy," states, in relevant part:

> NASHVILLE, Tenn. & GREENWOOD VILLAGE, Colo.--(BUSINESS WIRE)--
> Envision Healthcare Corporation ("Envision" or the "Company") (NYSE: EVHC) today announced organizational changes, including a realignment of the senior leadership structure under Christopher A. Holden, Envision's President and Chief Executive Officer, to reflect the Company's focus on its physician-centric strategic plan.

19

As part of its ongoing efforts to enhance its scale, physician-centric strategy and operational excellence, Envision has created the new role of Executive Vice President and Chief Operating Officer. The Executive Vice President and Chief Operating Officer will report directly to Mr. Holden, with responsibility for Envision's Physician Services and Ambulatory Surgery service lines. In addition, Envision announced the implementation of succession plans for its current Chief Financial Officer, Claire Gulmi, and President of Physician Services, Robert Coward.

70.     Following this announcement, Envision's stock price dropped $4.56 per share, or nearly 10%, from $47.67 per share on September 18, 2017 to $43.11 per share on September 19, 2017, on unusually large trading volume.

## V.     CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Envision securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Envision and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Envision's securities were actively traded on the NYSE, an open and efficient market, under the symbol "EVHC."  Millions of Envision shares were traded publicly during the Class Period on

the NYSE.  As of August 4, 2017, Envision had approximately 120.8 million shares of common stock outstanding.  Record owners and the other members of the Class may be identified from records maintained by Envision and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Envision;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts

about the business, finances, value, performance and prospects of Envision;

e) whether the market price of Envision common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

76. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. UNDISCLOSED ADVERSE FACTS

77. The market for Envision's securities was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Envision's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Envision's securities relying upon the integrity of the market price of the Company's securities and market information relating to Envision, and have been damaged thereby.

78. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Envision's securities, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

79. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Envision's financial well-being and prospects.

80. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII.  LOSS CAUSATION

81. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Envision's securities and operated as a fraud or deceit on Class Period purchasers of Envision's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Envision's securities

fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Envision's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

82. By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Envision's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Envision to conceal the truth.

83. Defendants' false and misleading statements had the intended effect and caused Envision's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

84. The decline in the price of Envision's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Envision's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Envision's securities and the subsequent decline in the value of Envision's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

24

## VIII. SCIENTER ALLEGATIONS

85.    As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading and omitted information that investors would have found material; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

86.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Envision, their control over, receipt and/or modification of Envision's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Envision, participated in the fraudulent scheme alleged herein.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

87.    At all relevant times, the market for Envision's securities was an efficient market for the following reasons, among others:

a)    Envision securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b)    As a regulated issuer, Envision filed periodic public reports with the SEC and the NYSE;

c)    Envision securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.

25

Each of these reports was publicly available and entered the public marketplace; and

d) Envision regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

88. As a result of the foregoing, the market for Envision's securities promptly digested current information regarding Envision from all publicly available sources and reflected such information in Envision's stock price. Under these circumstances, all purchasers of Envision's securities during the Class Period suffered similar injury through their purchase of Envision's securities at artificially inflated prices and a presumption of reliance applies.

89. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Envision's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.   NO SAFE HARBOR

90. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

91.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Envision who knew that the statement was false when made.

## XI.    COUNTS AGAINST DEFENDANTS

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

92.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

93.     During the Class Period, Envision and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Envision securities; and (iii) cause Plaintiff and the other members of the Class to purchase Envision securities at artificially inflated

prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

94.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Envision securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Envision, as alleged herein.

95.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

96.     Envision and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects

28

of Envision as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Envision's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Envision and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Envision's securities during the Class Period.

97. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

98.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Envision's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

99.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Envision securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Envision shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Envision securities during the Class Period at artificially inflated high prices and were damaged thereby.

100.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff

and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Envision, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Envision securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

101.    By virtue of the foregoing, Envision and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

<u>**COUNT II**</u>
**Violation of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

103.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.    The Individual Defendants were and acted as controlling persons of Envision within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or

31

shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

106.    As set forth herein, Defendants violated §§10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III
### Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against the Director Defendants)

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants.  This claim is based solely on negligence, not on any allegation of reckless, fraud or knowing conduct by or on behalf of the Director Defendants.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

108.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

109. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the Proxy Statement. The Proxy Statement contained proposals to Legacy Envision and AmSurg's stockholders urging them to vote in favor of the Merger between the two companies. The Proxy Statements, however, misstated or failed to disclose that: (1) Envision's growth and profitability were artificially inflated and/or maintained at inflated levels as a result of its illicit business practices; (2) the Company ordered physicians to administer tests that were medically unnecessary, admit patients from the emergency room into a hospital for financial reasons, and bill for the most complex, expensive level of care in unwarranted situations; (3) EmCare routinely arranged for patients who sought treatment at in-network facilities to be treated by out-of-network physicians; (4) EmCare accordingly billed these patients at higher rates than if the patients had received treatment from in-network physicians; (5) the Company's statements attributing EmCare's Class Period growth to other factors while failing to disclose that these illicit practices were materially contributing to the Company's growth were therefore false and/or misleading; and (6) as a result of the foregoing, Defendants' statements about Envision's business, operations, and prospects were false and misleading and/or lacked a reasonable basis when they were made. By reasons of the conduct alleged in this Complaint, the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of the Director Defendants' wrongful conduct, Envision misled or deceived its

33

stockholders by making misleading statements that were an essential link in stockholders heeding Envision's recommendation to approve the merger between Legacy Envision and AmSurg.

110.    The misleading information contained in the Proxy Statement was material to Envision's stockholders in determining whether or not to approve the merger between Legacy Envision and AmSurg.  The proxy-solicitation process in connection with the Proxy Statement was an essential link in the approval of the merger.

111.    Plaintiff, on behalf of Envision, hereby seeks relief for damages inflicted upon the Company based on the misleading Proxy Statement in connection with the approval of the merger between Legacy Envision and AmSurg.

112.    This action was timely commenced within three years of the date of the Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

34

d)   Awarding such other relief as this Court deems appropriate.

## XIII.   <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED: September 29, 2017

*/s/ Mark P. Chalos*
Mark P. Chalos (BPR# 19328)
Kenneth S. Byrd (BPR# 023541)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
One Nashville Place
150 Fourth Avenue, North, Suite 1650
Nashville, TN   37219-2423
Telephone:     (615) 313-9000
Facsimile:     (615) 313-9965
mchalos@lchb.com
kbyrd@lchb.com

*Local Counsel for Plaintiff Carpenters Pension Fund of Illinois*

Maya Saxena
Joseph E. White, III
Lester R. Hooker
**SAXENA WHITE P.A.**
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

-and-

Steven B. Singer
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com

*Counsel for Plaintiff Carpenters Pension Fund of Illinois*

35